### In re CHARLES GEORGE LAND RECLAMATION TRUST, Debtor.

#### Bankruptcy No. 83–0601–L.

United States Bankruptcy Court,
D. Massachusetts.

June 17, 1983.

Ann Rogers, Asst. Atty. Gen., Dept. of Atty. Gen., Boston, Mass., for Com. of Mass.

Christopher W. Parker, William F. Macauley, Craig & Macauley, Anton T. Moehrke, Wright & Moehrke, Boston, Mass., for debtor.

Herbert C. Kahn, Boston, Mass., for Creditors' Committee.

Gregor I. McGregor, McGregor & Associates, P.C., Boston, Mass., for Cannongate II Assn.

Matthew McGowan, Boston, Mass., for United States Trustee, William H. Tucker, Esq.

James M. Langan, Langan, Dempsey & Brodigan, Boston, Mass., for Town of Tyngsboro, Mass.

## MEMORANDUM DECISION

THOMAS W. LAWLESS, Bankruptcy Judge.

Heard on the United States Trustee's (U.S. Trustee) emergency motion for dismissal or, in the alternative, for the conversion of the Chapter 11 proceedings of the debtor in possession, Charles George Land Reclamation Trust (Debtor), to a case under Chapter 7 and the Town of Tyngsboro's emergency complaint for (1) an order authorizing the appointment of a trustee and (2) for the lifting of the automatic stay so as to allow the Commonwealth of Massachusetts (Commonwealth) and the Town of Tyngsboro to pursue certain pending state court litigation against the Debtor and its facility. At the hearing on these matters on June 7 and 9, 1983, the following were adduced:

The Debtor owns and operates a 63 acre waste disposal facility located in Tyngsboro, Massachusetts. During a period of time in the early 1970's, the Debtor accepted hazardous waste at the site. As a result of a suit brought by the Commonwealth of Massachusetts, through its Department of Environmental Quality Engineering (DEQE), the Debtor agreed to the entry of a Consent Judgment on March 20, 1978, which, among other things, required the Debtor to pay a civil fine of $25,000.00 and to undertake certain actions to bring the landfill facility into compliance with applicable environmental laws and regulations. On December 17, 1981, the Debtor and DEQE agreed to the entry of an amended agreement for judgment under which the Debtor agreed to "cap and seal" areas of the landfill, to install a leachate recirculation system,[1] to

---

1. "Leachate," as described to the Court, is the term used to describe the end product of water that percolates through refuse dumps. If the land fill site contains hazardous wastes, the leachate often becomes so contaminated.

conduct a ground water hydrology study and to obtain a bond or other financial security necessary for the closure of the landfill.

After a January 18, 1983 evidentiary hearing on a complaint for contempt filed by the Commonwealth, the Massachusetts superior court entered an order on February 4, 1983, compelling the Debtor to make payments into a special trust account, with withdrawals from this trust account being made by a designee of the Commonwealth's Department of the Attorney General and applied for payment of a groundwater hydrology study and for security and payment of the final costs of closure of the site. The Debtor defaulted on these payments and, on April 29, 1983, the Debtor filed for protection under Chapter 11 of the Bankruptcy Code (Code).

Also prior to filing, and in addition to the above actions initiated by the Commonwealth, the Debtor's operations were the subject of several orders issued by the Town of Tyngsboro Board of Health. State court litigation initiated to enforce said orders was pending at the time of the filing of the Debtor's Chapter 11 petition.

The emergency that prompted the June 7, 1983 hearing on the U.S. Trustee's motion and Tyngsboro's complaint was the Debtor's illegal disgorgement in late May of 1983, of 10,000 gallons of leachate contaminated with hazardous waste into a catch basin that drains into a brook which flows into the Merrimac River. The Merrimac is a source of drinking water for several downstream communities. While the Debtor in its written responses to the U.S. Trustee's and Tyngsboro's pleadings denied the disgorgement, at the hearings on this matter Debtor's counsel readily admitted that such discharge had taken place. The Debtor did dispute, however, that the discharge was

intentional, explaining that the leachate discharge was the result of a breakdown in the leachate recirculation pump system. At the initiation of the hearing on this matter on June 7, 1983, the Debtor filed a "consent to conversion" of the Debtor's Chapter 11 proceeding to one under Chapter 7, pursuant to 11 U.S.C. § 1112(a).[2] Despite the Debtor's voluntary conversion, however, the U.S. Trustee, joined by the Commonwealth and the town of Tyngsboro (holders of 75% in amount of the Debtor's listed unsecured claims), still pressed for dismissal of the Debtor's now Chapter 7 bankruptcy proceeding. After hearing preliminary arguments of counsel on the question of dismissal and the testimony of a representative for the Federal Environmental Protection Agency, the Court continued the hearing on dismissal to June 9, 1983, when it became apparent that all creditors had not received notice of the U.S. Trustee's motion to dismiss.

At the resumed hearing on the matter on June 9, 1983, the Debtor raised the following two procedural objections: (1) That the U.S. Trustee lacked standing to bring a dismissal motion, and (2) that the notice of the motion to dismiss was inadequate. With respect to the standing issue, the Debtor apparently overlooked the fact that the Debtor's two largest unsecured creditors, the Commonwealth and Tyngsboro, supported and joined in on the motion to dismiss. Furthermore, this Court categorically rejects the notion that the U.S. Trustee's responsibilities and powers do not encompass the right to seek dismissal of a case in appropriate circumstances. Finally, and as will appear later in the opinion, the U.S. Trustee additionally had standing to bring a dismissal motion, not as the U.S. Trustee, but as a default trustee under 11 U.S.C. § 15701(b)[3] due to the unwillingness of any

---

**2.** 11 U.S.C. § 1112(a) reads, in pertinent part, that: "The debtor may convert a case under this chapter to a case under chapter 7 of this title unless. . . ." None of the exceptions to the right to convert are applicable herein. In response to a later Court inquiry whether the Debtor's consent to conversion was a strategic attempt to remove the Debtor from the dis-

missal standards of 11 U.S.C. § 1112(b), Debtor's counsel vigorously denied same and offered to take the stand to testify to the Debtor's good faith intentions in filing the reorganization petition. The Court declined the invitation.

**3.** 11 U.S.C. § 15701(b) reads as follows: "If none of such persons [members of the panel of

private panel member to serve as trustee of this Debtor's estate.

As to the propriety of the notice on the motion to dismiss, 11 U.S.C. § 1112(b), § 707, and § 305(a) all require that dismissal may occur only after "notice and hearing." The phrase "after notice and hearing" means "after such notice as is appropriate in the particular circumstances, and such opportunity for a hearing as is appropriate in the particular circumstances...." 11 U.S.C. § 102(1)(A). This Court does, however, normally require at least ten days notice to all creditors on any motion to dismiss. *See* Interim Bankruptcy Rule 2002 (applicable to dismissal of the Chapter 11 proceedings) and Bankruptcy Rule 202. In view of the exigencies of this matter (as will also appear), the Court shortened the notice period to two days in accordance with the flexibility intended by Congress when enacting 11 U.S.C. § 102(1)(A).

On June 9, 1983, it became apparent that the U.S. Trustee would be called upon to serve as Chapter 7 trustee of this estate as no member of the panel of private trustees was willing to assume the responsibilities of this estate. The Federal Environmental Protection Agency had designated the Debtor's site as one of the worst hazardous waste sites in the country and had established it as a top priority for cleanup[4] under the Comprehensive Environmental Response, Compensation and Liability Act of 1980, 42 U.S.C.A. §§ 9601–9657 (Supp.1981) ("Federal Superfund"). A representative of the Federal Environmental Protection Agency (EPA) testified that the study required before a cleanup could be commenced could cost upwards of two million dollars. This study would determine the extent and nature of the contamination and outline the course to follow for the ultimate cleanup of the site. Although there was no firm evidence on what the ultimate cleanup costs would be, the U.S. Trustee alleged that the best estimate they had received was that the cleanup cost would fall in the neighborhood of five to ten million dollars. The EPA, the Commonwealth and Tyngsboro supported these estimates. The Debtor disputed these estimates, alleging that the cleanup costs would be substantially less.

In addition to these prospective costs, the Commonwealth, arguing in support of the motion to dismiss, asserted that there were continuing, ongoing violations of state environmental law at the Debtor's site that presented a danger to the public who lived in the vicinity of the Debtor's operations. The Commonwealth argued that any trustee appointed in these proceedings would have to immediately rectify these violations or otherwise find himself in violation of 28 U.S.C. § 959(b), which reads as follows:

(b) Except as provided in section 1166 of title 11, a trustee, receiver or manager appointed in any cause pending in any court of the United States, including a debtor in possession, shall manage and operate the property in his possession as such trustee, receiver or manager according to the requirements of the valid laws of the State in which such property is situated, in the same manner that the owner or possessor thereof would be bound to do if in possession thereof.[5] As amended Nov. 6, 1978, Pub.L. 95–598, Title 11, § 235, 92 Stat. 2667.

private trustees] is willing to serve as interim trustee in the case, then the United States trustee shall serve as interim trustee in the case."

**4.** The development of a list of high priority hazardous waste sites for cleanup and the ranking of same, is discussed in the preamble to the National Contingency Plan, 47 Fed.Reg. 31, 186–193 (July 16, 1983).

**5.** The conflict between the clear mandate of 28 U.S.C. § 959(b) and the recent line of cases holding, that where the state's exercise of its police power requires the substantial expenditure of monies, such exercise is not exempt from the automatic stay under 11 U.S.C. § 362(b)(4), *see, e.g., Matter of Penn Terra, Ltd.,* 24 B.R. 427 (Bkrtcy.W.D.Pa.1982) and *U.S. v. Johns-Manville Sales Corp.,* 18 E.R.C. 1177 (D.N.H.1982), is particularly troubling where there is, as I believe there is in the instant case, a serious and immediate threat of contamination to the general public. The inability of any trustee to comply with 28 U.S.C. § 959(b) was a major factor in the Court's ultimate decision to dismiss this case.

The Commonwealth contended that any Chapter 7 trustee would have an affirmative duty to comply with the previously issued outstanding State court injunctions to operate and maintain the leachate recirculation pump and to cover the refuse pile so as to avoid a repeat of the discharge that occurred during the Debtor's Chapter 11 proceedings. The Commonwealth argued that the Debtor's operations had been the subject of the active and constant supervision of a State court judge prior to filing and that he had been issuing very specific orders about the manner in which the cleanup should be effectuated. Arguing that the costs of the environmental study and ultimate cleanup would constitute claims[6] against the Debtor's estate by both the EPA, under the Federal Superfund, and the Commonwealth, under the Massachusetts Oil And Hazardous Material Release Prevention And Response Act, M.G.L. c. 21E § 5(a) (March 24, 1983) (State Superfund), and thus render any dividend to unsecured creditors nugatory, the Commonwealth moved the Court to allow the State court to resume complete control of the Debtor's assets in order to render a speedy cleanup.

The Debtor disputed many of the Commonwealth's allegations and questioned the Commonwealth's motives in seeking dismissal on the basis that the Commonwealth was the alleged recipient of various preferential payments under the February 4, 1983 order of the State superior court. The Debtor also contended that the dividend to unsecured creditors would be other than inconsequential.

The Town of Tyngsboro, the Debtor's second largest creditor, also strongly advocated that the case should be dismissed and returned to the supervision of the state court. The wells used as drinking water by a large condominium development, Cannongate II Associates, that abuts the Debtor's premises had been contaminated, necessitating the transportation and above-ground piping of water to the condominium development. While the Debtor denied that it was responsible for the well contamination, it did admit to the assumption of the responsibility for the transportation of water to the condominium owners during the preceding winter. Tyngsboro's counsel alleged that the May, 1983 leachate discharge was intentional on the part of the Debtor and further argued that the possibility of a dividend in the bankruptcy proceeding was far outweighed by the interests of the townspeople of Tyngsboro in seeing complete control of all the Debtor's assets revested in the State court.

Again, Debtor's counsel denied Tyngsboro's allegations. At the hearing on this matter and in its Memorandum in Opposition to United States Trustee's Motion to Dismiss, at 8–9, the Debtor contended that the arguments raised by the U.S. Trustee, the Commonwealth and Tyngsboro in support of dismissal, were irrelevant now that the Debtor had converted its proceedings to Chapter 7. The Debtor, citing *In re Donaldson Ford, Inc.,* 19 B.R. 425, 8 B.C.D. 1387 (Bkrtcy.N.D.Ohio 1982), asserted that it should be permitted to exercise its "constitutional right to take advantage of the provisions of the Bankruptcy Code,"[7] Debtor's Memorandum at 8, and that "interlopers" such as the U.S. Trustee should not be permitted to interfere with the Debtor's pursuit of that right.

As the case was converted to one under Chapter 7 on June 7, 1983 (when the Debtor

---

**6.** While the Commonwealth argued that these claims would constitute administrative priority claims under 11 U.S.C. § 726(a)(1), it would seem that the study and cleanup costs would constitute unsecured claims. A bill giving priority in bankruptcy proceedings to federal and state government claims to recover the costs of cleaning up hazardous substances under the Superfund law and the Resource Conservation and Recovery Act was introduced by Rep. James J. Florio (D–NJ) on Sept. 23, 1982 (H.R. 1972). H.R. 7172 suffered the same fate before the 97th Congress as did other bankruptcy legislation.

**7.** The Debtor's citation to *Donaldson, supra,* in support of its statement is, at best, misleading. *Donaldson* stands for the proposition that a State court lacks the power to prevent a debtor from exercising its constitutional right to *seek* relief. Nothing in the Constitution guarantees the *obtainment* of such relief, i.e. discharge.

consented to conversion) and no private trustee had been appointed by the time of hearing on this matter on June 9, 1983, during the hearing on the same day, the Court inquired when the U.S. Trustee would so designate himself as interim trustee under 11 U.S.C. § 15701(b) and file the appropriate papers with the Court. The U.S. Trustee's representative responded that, due to the magnitude of the problems surrounding the Debtor's operation and the possibility of personal liability upon a trustee under the Federal and State Superfund statutes, that the U.S. Trustee was unwilling and unable to serve as private trustee in this case. Whereupon the Court dismissed the Debtor's Chapter 7 case.

---

At the very outset, let it be known that if this Court did not think dismissal was appropriate under the circumstances of this case, the Court would have ordered the U.S. Trustee to serve as private trustee in this case. 11 U.S.C. § 15701(b) provides that the U.S. Trustee "shall serve" if no member of the private panel is willing to serve. The use of the imperative case leaves no discretion in the U.S. Trustee in this matter. In *In re Kontaratos,* 15 B.R. 298 (Bkrtcy. 1st Cir.1981), the Appellate Panel, of which I was a member, held:

> The U.S. trustee does not perform his responsibilities in a vacuum. This is so because we are concerned here with the public administration of otherwise private business matters. If he fails to perform his statutory duties, the bankruptcy court has ample authority under § 105(a) of the Code to order him to act. If he continues to refuse, the court may act in his stead and make whatever other appropriate orders may be necessary. The trustee's performance is essential to the bankruptcy system. Therefore, he can and will be ordered to perform those tasks which the bankruptcy court determines fall within the scope of his responsibility. *Id.* at 302 (footnote omitted).

11 U.S.C. § 105 provides: "The bankruptcy court may issue any order, process or judgment that is necessary or appropriate to carry out the provisions of this title." The Court did not order the U.S. Trustee to perform his statutory duty, nor did the Court act in his stead,[8] not because the Court was powerless to do so, but because such an order would not have been appropriate or in furtherance of the purposes of Title 11. I found dismissal to be the appropriate result under the circumstances of this case. 11 U.S.C. § 707.

This is so for a number of reasons. As discussed in note 5, *supra* page 921, it was impossible for any trustee to manage the Debtor's site in compliance with state law and thus meet the requirements of 28 U.S.C. § 959(b). The ongoing violation of state law and the serious and immediate danger posed to the citizenry in the surrounding area by these violations, mandated that the Federal and State environmental agencies be given full and complete control of the hazardous waste site as soon as possible. In all likelihood, the Chapter 7 trustee's response to this untenable situation (assuming that the Court ordered the U.S. Trustee to so assume that function) would be to file a "Notice of Intention to Abandon" the site as burdensome and of inconsequential value to the estate. *See* 11 U.S.C. § 554(a). The property, however, would remain property of the estate, subject to the trustee's responsibilities to maintain the leachate recirculation system and protected by the automatic stay of 11 U.S.C. § 362 until the ten day notice period expired. Assuming no objections to the abandonment and thus no Court hearing was required, the State and Federal agencies' ability to effectuate an expeditous cleanup would by no means be unfettered. Upon abandonment, this estate asset would revert back to the Debtor corporation which, now depleted of any funds (the trustee would not abandon those nonburdensome assets) would again be given an op-

---

**8.** *Compare In re Record and Tape Place, Inc.,* —— B.R. ——, slip op. (Bkrtcy.D.Mass. April 7, 1983).

portunity to demonstrate its inability to operate this facility in compliance with the law.

Moreover, while the Debtor did so, it would still enjoy the protection of the bankruptcy automatic stay with respect to that property. 11 U.S.C. § 362(c)(1) provides that the stay of an act against *property of the estate* under § 362(a) continues until such property is no longer *property of the estate* and in § 362(c)(2), the stay of *any other act* under § 362(a) continues until the happening of identified events—none of which are likely to occur in the near future if this case had been allowed to stay in Chapter 7. "As a result of the protections of Section 362(a)(5), the debtor's right's are not adversely affected by the abandonment decision of the trustee." *In re Gassaway*, 28 B.R. 842, 846 (Bkrtcy.N.D.Miss.1983) citing *In re Cruse Turner*, 8 B.R. 581 (Bkrtcy. D.Utah 1981); *see also In re Motley*, 10 B.R. 141 (Bkrtcy.N.D.Ga.1981). The Court does not mean to suggest that this Debtor would so use the intricacies of the bankruptcy law to impede the cleanup operations of the State and Federal agencies, but the very existence of the automatic stay would so do so. *See e.g.*, 11 U.S.C. § 362(a)(5) and *compare* M.G.L. c. 21E § 13 (lien provisions for cleanup costs).

The unwillingness of any member of the U.S. Trustee's panel of private trustees, and, for that matter, the U.S. Trustee himself, to become Chapter 7 trustee of the estate is understandable in view of the potentially unlimited and untested liability standards of both the State and Federal Superfund statutes. Hall, *The Problem of Unending Liability for Hazardous Waste Management,* Business Lawyer, February, 1983 at 593. Liability under the Massachusetts Superfund statute is joint and several and without regard to fault. *See* M.G.L. c. 21E § 5a (1983). Any person who violates *any* provision of the Massachusetts Superfund statute is liable for a fine of up to twenty-five thousand dollars a day for each day such violation occurs or imprisonment for a period up to five years. M.G.L. c. 21E § 11 (1983). This potential liability was disconcerting to potential Chapter 7 trustees of the estate in light of the fact that existing conditions at the Debtor's facility were alleged to be already in violation of the State Superfund statute.

Finally, and most importantly, the Court rejected and found obnoxious the suggestions in Debtor's Memorandum that this Court was somehow abdicating or shunning its responsibilities by dismissing this proceeding and allowing the state court to resume control over this Debtor. It was this Court's sense of responsibility—to the two largest creditors of this estate and to the interests of the public at large—that compelled the dismissal of this case. This was not a bankruptcy case where assets could be liquidated, claims adjudicated and a distribution made within a relatively short period of time, but rather it was and is an ongoing environmental nuisance that threatens the health, safety and well-being of the people who surround it. The dismissal of this case was a recognition by this Court that the appropriate forum to redress and correct this environmental nuisance in the most expeditious and efficient manner was the State court. This Court had neither the resources, the expertise or, for that matter, a suitably qualified trustee with experience in hazardous waste management, to do other than to allow the resolution of this matter by the continuing efforts of the appropriate state court. The specter of a dividend in this case [9] was not suffi-

---

9. Though no creditor opposed the motion to dismiss this case at the hearing on this matter on June 9, 1983, those that did but did not bother to voice their objections or appear at the hearing (not an unusual occurrence where the non-moving creditors only numbered 18, and they primarily were comprised of corporations with claims under $2,000.00) may take some solace in what I found to be the prospects of a negligible dividend in this case. The costs of the environmental study and the resultant cleanup would, and I so found, have been entitled to unsecured status in the bankruptcy proceeding. Those astronomical costs as well as the ever-present administrative expenses, would have resulted in a few pennies on a dollar. Even if this was not the case, I believe that the need to quickly resolve this health hazard transcended monetary considerations.

cient to justify the exposure of the surrounding populace to the possibility of a reoccurrence of another leachate discharge, similar to that which took place during the Debtor's Chapter 11 proceedings. Dismissal, with the concomitant elimination of the automatic stay, would allow the EPA and the DEQE to assert their full panoply of powers under the Federal and State Superfund statutes.

11 U.S.C. § 707 provides that a court may dismiss a case "only for cause, including _____ ..." two enumerated causes inapposite to the present situation. The legislative history reveals, however, that the listed "causes" are merely illustrative and were not intended to be exhaustive. I believed that, under the circumstances of this case, among other reasons because it was not capable of administration as a bankruptcy case, "cause" existed and the Court accordingly dismissed the Debtor's Chapter 7 proceeding.

An appropriate order has previously been entered.